IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Mar 12, 2014

| | |
|---|---|
| IN RE:<br><br>DAVID K. JOUETT and<br>SABRA B. JOUETT,<br><br>    Debtors. | Case No. 13-10005-M<br>Chapter 7 |
| STEPHEN E. HUBANKS,<br><br>    Plaintiff,<br><br>v.<br><br>DAVID K. JOUETT and<br>SABRA B. JOUETT,<br><br>    Defendants. | Adv. No. 13-01015-M |

## MEMORANDUM OPINION

One of my former law partners, an estate planning lawyer by speciality, once told me, "If you want to know the strength of family ties, drop a bucketful of money between them and watch what happens."[1]  Put another way, blood may be thicker than water, but it is often no match for the almighty dollar.  As one of the great vaudevillians of the twentieth century was fond of saying, and as this case so aptly illustrates, "ain't it the truth!"[2]

Stephen E. Hubanks ("Hubanks") went to prison in Oklahoma in February 2006.  He left behind a half-sister, Sabra Jouett ("Sabra"), a brother-in-law, David Jouett ("David"), the right to receive disability benefits, and an unresolved workmen's compensation claim.  While in prison, his workmen's compensation claim was settled.  Under the terms of the settlement, Hubanks was paid

---

[1]  Ronald C. Jensen, Omaha, Nebraska.

[2]  One of the many catch phrases used by Jimmy Durante (1893–1980).

over $112,000. That money, as well as monthly disability payments of approximately $2,600, was placed into an account over which Sabra exercised control. And exercise she did. Some of the money found its way into Hubanks's hands. Some was spent for his benefit. The vast majority was not. While Hubanks was in prison, Sabra and David managed to spend every dime of his money, buying items including but not limited to a BMW, a Porsche, a pool table, furniture, clothing, and a Carnival Cruise. Sabra claims that Hubanks consented to the spending. Hubanks calls Sabra a liar.

In the fall of 2010, Hubanks was released from prison. He went to live with Sabra and David. On New Year's Eve, he discovered his money was gone. After years of being sued by Hubanks, Sabra and David filed their bankruptcy case, seeking to have any obligations they may owe to Hubanks discharged. Hubanks asks this Court to find that David and Sabra owe him every penny they took, and to prevent those amounts from being discharged. Hubanks also seeks an award of punitive damages and his attorney's fees. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.A. § 1334(b).[3] Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C.A. § 157(a). This is a core proceeding as contemplated by 28 U.S.C.A. § 157(b)(2)(I).

---

[3] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq*. (West 2014). All other references to federal statutes and rules are also to West 2014 publications.

## Burden of Proof

Hubanks claims that the amounts owed to him by Sabra and David may not be discharged under § 523(a)(2)(A), § 523(a)(2)(B), and/or § 523(a)(4) of the Bankruptcy Code. Under each of these sections, the burden is on Hubanks to establish the necessary elements by a preponderance of the evidence.[4]  Exceptions to discharge are to be narrowly construed in favor of the debtor and against the creditor.[5]

## Findings of Fact

In the late 1990s, Hubanks was employed by General Electric or a similar company as an "appliance serviceman." He suffered a back injury in the course of his employment. A workmen's compensation case was opened. Hubanks received some benefits, and was able to return to work. A few years later, Hubanks injured his back again. This time, the injuries were apparently more severe.  A second workmen's compensation case was opened, and the first case revisited. Ultimately, the Social Security Administration (the "SSA") declared Hubanks permanently and totally disabled. As a result, Hubanks began to receive SSA disability payments of approximately $1,200 per month.  Hubanks (or his employer) carried disability insurance issued by Met Life that paid Hubanks an additional $1,400 per month.

Sabra is Hubanks's half-sister.  She is a "mortgage loan originator" by profession.  At all times relevant hereto, she has been married to David.  The Court is not certain what David does for a living; in limited questioning, David described himself as a "consultant" dealing with "conflict minerals."  In response to the question of whether he was a financial consultant, David responded

---

[4]  *Grogan v. Garner,* 498 U.S. 279, 287-88 (1991).

[5]  *In re Black,* 787 F.2d 503, 505 (10th Cir. 1986), *abrogated on other grounds by Grogan*, 498 U.S. at 279.

with an unequivocal "no."  When it comes to the financial affairs of the household, David hides behind a wall of ignorance.  In David's own words, when it came to the family finances, he did not handle the accounts, and he "did not know and did not ask" where the money came from.

In September of 2005, David and Sabra opened a joint checking account at Arvest Bank (the "Jouett Account").[6]  David and Sabra each had access to the Jouett Account.  Each were issued debit cards they could use to withdraw monies from or make purchases using the Jouett Account.[7]  One or both of them used the Jouett Account on a daily basis.

By August 2006, Hubanks had developed a drug addiction.  He was sitting in jail, and needed bail money in order to get out.  He called Sabra and asked for her help.  In order to post bail, he needed access to money in his bank accounts.  In an effort to assist Hubanks, Sabra went to the internet and found two separate power of attorney forms, one entitled "Oklahoma Statutory Form for Power of Attorney," (the "Statutory POA"),[8] and another entitled "Oklahoma General Durable Power of Attorney" (the "Durable POA")[9] (collectively, the "powers of attorney").  The powers of attorney appointed Sabra as the attorney-in-fact for Hubanks.  They authorized Sabra to manage virtually all of Hubanks's business and personal affairs, including all banking and financial transactions.  Hubanks signed both powers of attorney in the presence of a notary.  Sabra signed the Durable POA as the "Agent" thereunder.  These words were printed in all capital letters directly above her signature:

BY ACCEPTING OR ACTING UNDER THE APPOINTMENT, THE AGENT ASSUMES THE FIDUCIARY AND OTHER LEGAL RESPONSIBILITIES OF AN

---

[6]  *Plaintiff's Exh. 12-1.*

[7]  *Plaintiff's Exh. 12-5 and –7.*

[8]  *Plaintiff's Exh. 8.*

[9]  *Plaintiff's Exh. 9.*

AGENT.[10]

Sabra was able to use the powers of attorney to obtain money from Hubanks's bank account (or accounts), and Hubanks was able to post bond. The powers of attorney were never revoked.

It became apparent that Hubanks would be incarcerated for an extended period of time. As a result, on February 20, 2007, Hubanks opened a checking account (the "Hubanks Account") at Arvest Bank.[11]  Hubanks and Sabra were authorized signers on the Hubanks Account. In addition, Sabra obtained a debit card allowing her to withdraw funds from the Hubanks Account from ATMs, and make direct purchases from retailers. Hubanks made arrangements for his SSA and Met Life disability checks to be directly deposited in the Hubanks Account.

On February 22, 2007, Hubanks pled guilty to various criminal charges. He was immediately incarcerated in an Oklahoma state prison. While Hubanks was in prison, he did not receive copies of the monthly statements relating to the Hubanks Account. Those statements were sent to Sabra. While he was in prison, Sabra told Hubanks that the payments from the SSA and Met Life had stopped, and that those monies were not being deposited into the Hubanks Account.[12] The statement was untrue. Each month while Hubanks was incarcerated, the SSA and Met Life deposited monies into the Hubanks Account. The SSA deposits ranged in amount from $1,209.00 to $1,314.00, while the Met Life payment remained constant at $1,442.68. During the period of Hubanks's incarceration, these checks totaled  $116,551.24.[13]

---

[10] *Plaintiff's Exh. 9-6.*

[11] *Defendants' Exh. 4.*

[12] Sabra denies ever making such a statement to Hubanks. The Court rejects Sabra's testimony and finds Hubanks to be a much more credible witness on this and every other factual issue presented to the Court.

[13] *Plaintiff's Exh. 1.*

Each month, with the alacrity of a twelve-year-old spending his or her first allowance, Sabra emptied the Hubanks Account. Within a day or two of the automatic deposit of funds by the SSA or Met Life, Sabra took the money for her own purposes. She took cash through ATM withdrawals. She bought products from, among others, General Electric, Lowe's, Sam's Club, and Walmart.[14] She bought furniture[15] and children's clothing.[16] She paid her insurance premiums[17] and her cable bill.[18] Oftentimes she wrote checks to herself.[19] It appears that some of these checks were deposited into the Jouett Account.[20] Sabra eventually dispensed with the writing of checks and utilized electronic transfers to move the SSA and Met Life monies from the Hubanks Account to the Jouett Account.[21] Suffice it to say, by the time Hubanks was released from prison, virtually every penny of the funds received from the SSA and Met Life had been spent by Sabra.[22]

The monthly disability payments were not the only source of funds deposited into the Hubanks Account. After his incarceration, Hubanks's second workmen's compensation claim remained at issue. John Forbes ("Forbes"), an attorney with offices in Midwest City, Oklahoma,

---

[14] *Plaintiff's Exh. 1-23 and -36.*

[15] *See, e.g., Plaintiff's Exh. 1-40* (Mathis Brothers, a well known Oklahoma furniture retailer).

[16] *See, e.g., Plaintiff's Exh. 1-49* (American Eagle and Gap Kids).

[17] *Id.* (Allstate).

[18] *Plaintiff's Exh. 1-66* (Cox Cable).

[19] *See, e.g., Plaintiff's Exh. 1-10.*

[20] *See, e.g., Plaintiff's Exh. 1-88 and Plaintiff's Exh. 12-180* ($1,000.00 check drawn on the Hubanks Account and deposit of $1,000.00 into the Jouett account on March 28, 2008).

[21] *See, e.g., Plaintiff's Exh. 1-135.*

[22] The examples given herein are illustrative rather than exhaustive. This is a judicial opinion, not a forensic audit.

represented Hubanks with respect to two workmen's compensation claims.[23]  Forbes has been in

private practice since 1979.  He estimates that three quarters of his practice focuses upon workmen's

compensation and Social Security disability claims.  A reading of Forbes's trial deposition left the

Court with the firm impression that Forbes is a skilled and knowledgeable attorney.

    Forbes was able to negotiate a settlement of the second workmen's compensation claim with

Hubanks's approval.  The settlement came to fruition on July 15, 2008.  On that date, Forbes

presented Sabra with a document entitled "Settlement Sheet."[24]  Under the terms set forth in the

Settlement Sheet, Hubanks was to settle his workmen's compensation claim for the gross sum of

$144,971.24.  Part of the settlement consisted of a "Medicare Set Aside" payment of $19,971.24.

The remaining balance of $125,000.00 was subject to deductions for attorney's fees, costs, expert

report fees, cost of copying various medical records, and a fee described as the "MITF Report Fee."

At the end of the day, the settlement resulted in net proceeds to Hubanks of $93,793.99, plus the

Medicare Set Aside payment of $19,971.24.  Although Sabra had nothing to do with the negotiation

of the terms outlined in the Settlement Sheet, she executed the Settlement Sheet "on behalf of Steve

Hubanks."  Forbes relied upon the powers of attorney as his authority for dealing with Sabra.  On

the basis of the powers of attorney, Forbes delivered the two settlement checks, each made payable

to Hubanks, (the "Settlement Funds") to Sabra.  The Settlement Funds were deposited in the

Hubanks Account on July 16, 2008.[25]

    In addition to the $19,971.24, there were to be annual payments of $2,276.17 in additional

---

[23]  It appears from the record that the first workmen's compensation claim was resolved
prior to Hubanks's incarceration.

[24]  *Plaintiff's Exh. 3.*

[25]  *Plaintiff's Exh. 3-2.*

Medicare Set Aside payments for a period of 22 years, commencing on February 1, 2009.[26]  The payment was later amended to be in the amount of $4,703.00, payable annually commencing on May 12, 2010.[27]  The May 2010 payment in the amount of $4,703.00 was made by check dated May 1, 2010, and deposited in the Hubanks Account on May 10, 2010.[28]  The funds were transferred to the Jouett Account on May 11, 2010.[29]

The Set Aside Payments are of particular significance.  According to Forbes, Medicare requires these payments to be placed in a separate account, and to be used ***only for*** medical expenses incurred as a result of the injury that is the subject of the workmen's compensation claim.  The party receiving the Set Aside Payments (in this case, Hubanks) is required to keep detailed records of how this money is spent.  Medicare will provide coverage for medical expenses related to the injury ***only after*** the funds represented by the Set Aside Payments have been exhausted.  Medicare reserves the right to require additional Set Aside Payments in future years if they are warranted by the circumstances.  If the Set Aside Payments are misspent, the claimant (in this case, Hubanks) is not eligible for Medicare coverage for expenses incurred to treat the injury that was the subject of the workmen's compensation claim.

Forbes explained the nature of the Set Aside Payments to Sabra in great detail, emphasizing the requirements that the money be placed into a separate account and be used only for medical expenses related to Hubanks's injury.  Forbes testified that Sabra advised him that she had in fact placed the Set Aside Payments in a segregated account as required.   Sabra claims that she knew

---

[26]  *Plaintiff's Exh. 7-2.*  Hereafter, all of the Medicare Set Aside payments shall be collectively referred to as the "Set Aside Payments."

[27]  *Plaintiff's Exh. 6-3.*

[28]  *Plaintiff's Exh. 1-158.*

[29]  *Plaintiff's Exh. 1-156.*

nothing about the nature of the Set Aside Payments or any restriction on their use; in her mind, it was just additional money paid to Hubanks in settlement of his workmen's compensation claim. Sabra testified that she only learned about the restrictions placed upon the Set Aside Payments when Hubanks filed suit against her. Sabra also denies being told anything by Forbes about the Set Aside Payments at any time.

The Court accepts Forbes's testimony, and gives no weight to the statements made by Sabra. Forbes is an experienced workmen's compensation attorney. He is well versed in Medicare law, and fully aware of the consequences if the rules governing a Medicare set aside payment are not followed. Forbes was adamant in his testimony that he informed Sabra of these requirements, and that he did his best to make sure she understood them. It is almost inconceivable to suggest that an experienced workmen's compensation lawyer would fail to inform a client (or a party acting on behalf of a client) of Medicare requirements that, left unfulfilled, would result in a denial of medical coverage for the condition that caused the client's permanent disability. It is a level of conduct akin to malpractice. The Court finds as a matter of fact that Forbes informed Sabra of the Medicare requirements with respect to the Set Aside Payments, as well as the consequences of a failure to comply with those requirements, and that she was fully aware of these requirements when she received the Settlement Funds. The Court also finds as a matter of fact that Sabra told Forbes that she had established a separate account and placed the Set Aside Payments in that account.

On July 17, 2008, one day after the Settlement Funds were deposited in the Hubanks Account, Sabra transferred $40,000 from the Hubanks Account to the Jouett Account. From there, the money was used to pay debts owed by David and Sabra, including personal loans made to them by family members. Other expenditures included payments to collection agencies, a $2,000 payment to "Jenks Varsity Pom" for a daughter's cheerleading expenses, and the payoff of a car loan in

excess of $6,700.[30] All of these funds were expended in less than two weeks.

Shortly after the $40,000 transfer, Sabra told Hubanks that she had taken the money.  She did not tell him what the money had been used for.  The conversation took place in the visitation room at the prison where Hubanks was incarcerated.  This was the first Hubanks knew of the transfer.  In response, Hubanks told Sabra, in plain and simple terms, "don't be taking my money."  Although Hubanks was very upset by the taking of the $40,000, he did not overtly react, for fear of being placed in solitary confinement.  Sabra admits that a conversation took place between herself and Hubanks.  Sabra claims that she asked permission to borrow $40,000 from Hubanks in order to pay some past due bills that she and David owed to creditors.  The purpose of "clearing up her credit," to use Sabra's words, was to "help him [Hubanks] in his future endeavors."  She claims that Hubanks approved the use of his money for these purposes.  The Court finds Hubanks to be a far more credible witness and accepts his version of the facts.

After the meeting between Hubanks and Sabra where the use of the $40,000 was discussed, Hubanks wrote Sabra a letter.[31]  The letter included the following passage:

> I hope you have done what I told you to do with my money.  I can never reach you by phone anymore.  I hope you can pay that money back by the time I get out.  You seem to be blowing and going all over.  No matter what I'll be out in 15 months.  I will discharge in 15 months no matter if I make parole or not.  And as I told you payments on the 40K will not help me.[32]

When asked about this letter, and specifically what Hubanks told her to do with his money, Sabra

---

[30]  Again, these payments are illustrative, not exhaustive.  The Court also recognizes that the Settlement Funds were commingled with funds Sabra and David received from other sources. It is nigh impossible to trace all of Sabra's spending with any exactitude. What is clear is that, at the end of the day, all of the Settlement Funds are gone, and Sabra spent them.

[31]  *Defendants' Exh. 2.*

[32]  *Id.*

testified that she was told to put the money in an interest bearing account.  The inconsistency between this testimony, her other testimony, and her conduct is hard to overlook.

Hubanks's instructions to place his money in an interest bearing account fell on deaf ears. The spending spree continued.  On August 14, 2008, Sabra transferred another $52,000 from the Hubanks Account to the Jouett Account.[33]  That same day, there is a payment out of the Jouett Account in the amount of $29,303.50 to "Salt Lake Imports."  Sabra testified that she decided to buy David a Porsche automobile, using a bonus check she received from her employer.  There are at least two flaws in Sabra's story: (1) the bonus check was for $9,523.27, an amount some $20,000 *less* than the price of the Porsche; and (2) Sabra deposited her bonus check in the Jouett Account *after* she had made the payment to Salt Lake Imports.  The Court concludes that money from the Hubanks Account was used to purchase the Porsche.  Other significant expenses incurred after the deposit of the $52,000 included numerous clothing expenses, the purchase of a pool table for $4,335.25,[34] and an electronics purchase in excess of $2,000.[35]  As of Christmas Day, 2008, the Jouett Account was overdrawn, meaning all of the $92,000 transferred from the Hubanks Account to the Jouett Account had been expended.[36]

In 2009, Sabra and David bought a residence in Sapulpa, Oklahoma with a purchase price of approximately $310,000 (the "House").  The House was purchased with no down payment.  The only documentary evidence before the Court regarding the purchase of the House is a letter dated

---

[33] *Plaintiff's Exh. 12-247.*

[34] *Plaintiff's Exh. 12-268.*

[35] *Plaintiff's Exh. 12-298.*

[36] *See Plaintiff's Exh. 12-363* (showing Jouett Account overdrawn by $633.03).

February 23, 2009, authored by David and provided to a prospective lender.[37]  In the letter, David makes specific reference to the economic hardships that he and his family faced since 2001, and expressly represents to the lender that, as a result of hard work and using his "financial consulting skills," he and Sabra "saved enough money to pay off all bills in July 2008."  One is left to ponder why David professed to have financial consulting expertise in the face of his testimony that he had never been a financial consultant.   Given David's ignorance regarding the family's finances, the Court wonders why he claimed to have saved enough money in July 2008 to pay his family's debts. In any event, the statement is inaccurate.  The bills that were paid in July 2008 were paid with funds from the Hubanks Account, and not with savings.  A cursory review of the Jouett Account and the Hubanks Account reveals that "savings" was not a part of the Jouett economic vocabulary.

On or about August 5, 2009, Forbes received an additional $18,774.76 in Set Aside Payments for the benefit of Hubanks.  In a letter of the same date addressed to Sabra, Forbes informed Sabra that the $18,774.76 represented Set Aside Payments subject to the same requirements and restrictions as the prior Set Aside Payments, and reminding her that if the funds were used for any purpose other than medical treatment, Hubanks "risk[ed] losing further Medicare coverage."[38]  Sabra picked up the letter and the check from Forbes's office on August 5, 2009, and deposited the funds in the Hubanks Account the same day.[39]

Once again, this money burned the proverbial hole in Sabra's pocket.  On August 12, 2009, Sabra transferred $18,800 from the Hubanks Account to the Jouett Account.  Two days before, Sabra

---

[37]  *Plaintiff's Exh. 24-58.*

[38]  *Plaintiff's Exh. 5-1.*

[39]  *Defendants' Exh. 42.*  For the record, Sabra denies receiving the August 5, 2009, letter, and claims that all she was given was the check for $18,774.76.  For reasons that are thoroughly explained in this opinion, the Court rejects her testimony.

had written a check for $16,899.50 to BMW of Tulsa for the purchase of a 2004 BMW.[40]  A review of the Jouett Account records for the month of August 2008, reveals that, had the $18,800 not been transferred, the check to BMW of Tulsa would most likely not have cleared.[41]  The Court finds for purposes of its decision that the $18,800 transfer from the Hubanks Account was made in order to pay for the 2004 BMW.[42]

When it comes to the justification for her use of the money, Sabra's explanations, are, in a word, incredible.[43]  At trial, she testified that the Hubanks Account was a joint account, and, as a result, there were absolutely no restrictions on how she could spend the money.  In other words, once Hubanks's money went into this account, it became hers to spend as she saw fit.  Sabra also testified that she and Hubanks had an oral agreement whereby Hubanks agreed that Sabra could spend any and all of his settlement money, in exchange for a promise that Sabra (and perhaps David as well) would assist Hubanks in future business ventures.  Finally, Sabra testified that she considered her use of the money in the Hubanks Account to be in the nature of a "loan," and that she intended to repay every penny.  She was also asked if she considered the money to be a gift from Hubanks and answered with an unequivocal "no."

This testimony is in stark contrast to her testimony given at a deposition taken in February 2012.  In this deposition, used by Hubanks's counsel to impeach her at trial, Sabra testified that she transferred money from the Hubanks Account to the Jouett Account because Hubanks told her to

---

[40] *Plaintiff's Exh. 12-444.*

[41] *Plaintiff's Exh. 12-426 to -448.*

[42] Even if one rejects the Court's finding in this regard, the $18,800.00 was spent for the benefit of David and Sabra.  All one needs to do is look at the records for the Jouett Account during the month of August 2008.

[43] From www.merriam-webster.com/dictionary/incredible:  *incredible* (adj): too extraordinary and improbable to be believed.

do so.  She also testified that the transfer of $40,000 from the Hubanks Account to the Jouett Account was a gift from Hubanks to Sabra.  At that same deposition, Sabra never took the position that the monies she took from the Hubanks Account were in the nature of a loan.  At trial, Sabra attempted to reconcile her inconsistent testimony by saying that "gave and me and borrow [sic] could be the same thing."  In spite of this testimony, the Court is not persuaded that "gave" and "borrow" are synonyms, or that Sabra, with her experience in the business of mortgage lending, truly believes them to be synonyms.

Sabra's story about the $40,000 "loan" is uncompelling.  She has no documentation to support it.[44]  Moreover, her use of the money is not consistent with her story.  If she wanted the $40,000 to pay off debts and improve her credit, one can only ponder why she bought (among other things) a Porsche, a BMW, and other luxury items, such as the pool table.  She admits that, after learning of the taking of the $40,000, Hubanks told her to put his money in an interest bearing account.  Notwithstanding those instructions, she continued to spend every penny paid to Hubanks as if it were her own, without just cause or reasonable explanation.  Her story shifts with the wind.

---

[44]  On the morning of trial, her counsel informed the Court that, ***that very morning***, Sabra provided him with a document purporting to be a loan document between Hubanks and Sabra (and possibly David as well).  The document was not identified in the pre-trial order governing this adversary proceeding, and had never been produced in discovery, even though Hubanks had filed a formal request for production of "any agreements between you [Sabra and/or David] and Stephen Hubanks from January 1, 2006, to the current date and continuing" (*Docket No. 14*) and even though the Court had entered an order compelling Sabra and David to produce those documents (*Docket No. 18*).  Counsel for Sabra gave no reason for the failure to produce this "smoking gun" of a document, other than to say that he had only received the document that morning.  Hubanks's counsel objected to the introduction of the document and to any testimony regarding the document on the basis of the failure to produce the document, failure to identify the document in the pre-trial order, and unfair surprise regarding the existence of the document.  *See* Fed. R. Civ. P. 37(b)(2)(A)(ii) (made applicable by Fed. R. Bankr. P. 7037) (allowing the court, as a sanction for failing to comply with discovery orders, to "prohibit[] the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence.").  The Court, believing that the Federal Rules of Civil Procedure and the orders of this Court are worthy of enforcement, sustained the objection.

The Court is not persuaded by any of it.[45]

Hubanks was paroled on October 14, 2010.  Sabra picked him up at the prison and brought him to the House, where he lived for a period of time.  When he inquired of Sabra about the monies in the Hubanks Account, he was told that the money had been moved into another account.  Hubanks asked Sabra to help him withdraw $40,000 from his account in order to, among other things, purchase a motor vehicle.  In response to these requests, Hubanks testified that Sabra "kept putting me off and putting me off and ignoring me."  Hubanks also testified that he was unable to travel to an Arvest Bank location to review his account because he did not yet have a driver's license, and that he did not have online access to the Hubanks Account.

Matters came to a head on December 31, 2010.  On that day, Hubanks confronted Sabra and asked her, "where is my money?"  David told Hubanks that $82,000 of his money had been used for the purchase of the House.[46]  Eventually Sabra told Hubanks that all of his money was gone. Hubanks demanded that Sabra and David sell the House in order to repay him.  They refused, told Hubanks his money was lost and there was nothing he could do about it, and left the premises. Hubanks immediately called Forbes and asked for advice.  Forbes counseled Hubanks to remain calm and take no hostile action, as such action might give David or Sabra an opportunity to seek the revocation of Hubanks's parole and have Hubanks returned to prison.  Forbes also asked Hubanks to meet with him immediately.

Hubanks readily admits that some of the monies deposited into the Hubanks Account were used for his benefit.  Hubanks estimated the amount to be approximately $11,353.33; Sabra

---

[45]  The Court found Sabra to be a non-credible witness.  She was continually evasive in her answers, often refusing to answer the question posed to her until instructed to by the Court.

[46]  David categorically denies ever making such a statement.  The Court finds Hubanks's testimony to be credible, and accepts his version of the facts.

estimated the amount to be much higher, at approximately $26,000.  At trial, Hubanks agreed to give David and Sabra credit for $26,497.86 in monies paid out of the Hubanks Account for his benefit. The records before the Court reveal that a total of $256,607.09 in SSA benefits, disability insurance checks, workmen's compensation settlement checks, and Set Aside Payments were paid into the Hubanks Account and ultimately spent by Sabra.  This leaves $230,109.23 unaccounted for (i.e., spent by Sabra without justification).  The parties agree that Sabra has paid back $1,000 of the money taken.  We are left with $229,109.23 at issue, plus any amount the Court might award in attorney's fees and/or punitive damages.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

## Conclusions of Law

Hubanks contends that the amounts taken from the Hubanks Account should be declared nondischargeable under § 523(a)(2)(A), (a)(2)(B), and/or (a)(4).  Unfortunately, Hubanks's counsel chose not to spend his closing argument informing the Court as to how David and/or Sabra's conduct fell within the parameters of any of these statutory provisions.  While the Court will not act as advocate for any party, it is well familiar with this area of the bankruptcy law, and the evidence leads to rather obvious conclusions.

### § 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.[47]

---

[47]  § 523(a)(2)(A).

In order to prevail under this section, a creditor must establish each of the following elements by a preponderance of the evidence:

    (1)     That a representation was made by the debtor;

    (2)     That the representation was false;

    (3)     That the representation was made with the intent to deceive the creditor;

    (4)     That the creditor relied upon the representation;

    (5)     That such reliance was justifiable; and

    (6)     That, as a result of such reliance, the creditor suffered loss.[48]

Unless all of these elements are established by a preponderance of the evidence, the debt is dischargeable.  Let us consider each element in turn.

*False Representations*

The record before the Court presents two potentially false representations: (1) the statement made by Sabra to Hubanks that the SSA and Met Life had ceased making disability payments; and (2) David's statement that $82,000 in workmen's compensation settlement funds had been used to facilitate the purchase of the House.  There is no disputing that both of these representations were false.  The disability payments continued to flow into the Hubanks Account after Hubanks went to prison.  According to David's uncontroverted testimony, the House was purchased with no down payment.  There is no evidence to suggest that $82,000 of Hubanks's money went toward the purchase of the House in some other fashion.

*Intent to Deceive*

When it comes to the issue of intent to deceive, the Court must make a factual finding

---

[48]  *AT&T v. Herrig (In re Herrig),* 217 B.R. 891, 895–96 (Bankr. N.D. Okla. 1998).

regarding the subjective intent of the defendants.[49]  The United States Court of Appeals for the Tenth

Circuit has held that § 523(a)(2)(A) "includes only those frauds involving moral turpitude or

intentional wrong, and does not extend to fraud implied in law which may arise in the absence of

bad faith or immorality."[50]  Other courts have noted that "intentional deceit is a critical note in the

score" of determining fraud.[51]  While there are several approaches used by courts to determine

whether a debtor has made a representation with the intent to deceive a creditor, the Tenth Circuit

has adopted the "totality of the circumstances" approach.[52]  Courts that have used this approach

acknowledge the fact that rarely, if ever, will a debtor admit his or her intent to deceive while under

oath.[53]

The questions are whether Sabra intended to deceive Hubanks when she told him that the

monies from the SSA and Met Life were no longer being deposited into the Hubanks Account, and

whether David intended to deceive Hubanks when he told Hubanks that $82,000 in Settlement Funds

and/or disability payments had been used as a means to finance the purchase of the House.  The

answer to both questions is a resounding yes.  Sabra knew the disability payments continued after

Hubanks was incarcerated.  She monitored the Hubanks Account, and withdrew or spent the

---

[49]  *Id.* at 897 (alleged fraudulent use of a credit card requires finding of whether at the time of the charges in question, the debtor intended to repay them).

[50]  *In re Black*, 787 F.2d 503, 505 (10th Cir. 1986), *abrogated on other grounds* by *Grogan v. Garner*, 498 U.S. 279 (1991); *see also DSC Nat'l Prop. v. Johnson (In re Johnson)*, 477 B.R. 156, 169 (10th Cir. BAP 2012).

[51]  *In re Johnson,* 477 B.R. at 169.  *See also In re Mones*, 169 B.R. 246, 254 n.6 (Bankr. D.D.C. 1994) (for purposes of § 523(a)(2), "debtor's conduct must involve moral turpitude or intentional wrong"); *In re Schmidt*, 70 B.R. 634, 639 (Bankr. N.D. Ind. 1986) (same).

[52]  *In re Young*, 91 F.3d 1367, 1375 (10th Cir. 1996), abrogated on other grounds by *Field v. Mans*, 516 U.S. 59 (1995).

[53]  *In re Eashai*, 87 F.3d 1082, 1090 (9th Cir. 1996).

disability payments as quickly as they came in.  If Hubanks believed there were no disability payments, he would not ask questions, and Sabra would be free to spend the money without Hubanks's knowledge or interference, which is exactly what she did.  Put simply, the Court finds that Sabra told Hubanks a bald-faced lie when she told him the disability payments had stopped, and intended to deceive him as she did so.

The Court also finds that David intended to deceive Hubanks when he told him that money from the Hubanks Account was used to facilitate the purchase of the House.  While David may have known little about the day-to-day finances of the Jouett family (assuming his testimony to be true), the record reflects that he was directly involved in the purchase of the House.  David also knew that the House was purchased without a down payment.  He knew that fact at the time of trial, and he knew it on New Year's Eve 2010.  At the time David told Hubanks that Hubanks's money was used to purchase the House, Hubanks was in the middle of a direct conversation with Sabra about his money.  Perhaps David thought his misrepresentation would diffuse the situation.  Perhaps he had other reasons: if so, they are not part of the record before this Court.  In any event, the Court finds that David's statement to Hubanks that $82,000 of Hubanks's money was used to purchase the House was false, and was made with the subjective intent to deceive Hubanks, if only to diffuse the confrontation between Hubanks and Sabra.

*Justifiable Reliance*

The next element of § 523(a)(2)(A) requires a finding that Hubanks relied upon the representations made by Sabra and/or David.  The doctrine of justifiable reliance is subjective in nature and

> does not require the creditor prove he acted consistent with ordinary care and prudence.  Instead, "[j]ustification is a matter of the qualities and characteristics of the particular [creditor], and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."  A creditor is only

required to make an investigation beyond the representations given where "under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived."[54]

The Court must consider the circumstances in a particular case, and the knowledge and understanding of the people in those circumstances, in order to determine whether a party justifiably relied upon a false representation.

Hubanks was justified in relying upon Sabra's representations that the monthly payments from the SSA and Met Life had stopped.  Sabra was Hubanks's half-sister.  She had come to his aid in the past when it came to posting bond in order to get him out of jail.  He had no reason to doubt her statements about the disability payments, and no way to independently verify them, as the bank statements for the Hubanks Account were sent to Sabra.  Based upon Sabra's representations, no money was going into the Hubanks Account, and he had no reason to demand the statements.

Likewise, Hubanks had no reason to doubt David's statements regarding the use of Hubanks's money to purchase the House, nor did he have any means to investigate or verify the statements.  The problem for Hubanks is that he did not rely upon those statements.  By the time David made them, all of Hubanks's money was gone.  Accordingly, any claim against David under § 523(a)(2)(A) fails at this point.[55]

---

[54]*William W. Barney, M.D. P.C. Retirement Fund v. Perkins (In re Perkins),* 298 B.R. 778, 792 (Bankr. D. Utah 2003) (quoting *Field v. Mans,* 516 U.S. 59, 70-71 (1995)) (footnotes omitted).

[55]  One could also consider this not an issue of reliance, but one of damages.  Hubanks was not damaged by David's false representations because, by the time those representations were made, the damage had already been done.  Either way, the direct claim fails.  Hubanks's claim that David is liable to Hubanks on a theory of conspiracy is dealt with later in this Memorandum Opinion.

*Damages*

As a result of Sabra's misrepresentations, Hubanks has lost all of the disability payments from the SSA and Met Life received during his incarceration. Those payments are in the total amount of $116,551.24. Hubanks is entitled to a judgment against Sabra in that amount, as well as a finding that the judgment is nondischargeable under § 523(a)(2)(A).[56]

**§ 523(a)(2)(B)**

§ 523(a)(2)(B) of the Code excepts from discharge any debt

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

\* \* \*

(B) use of a statement in writing--

(I) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.][57]

Unlike § 523(a)(2)(A), which allows for non-dischargeability based upon oral fraudulent representations, § 523(a)(2)(B) is rather specific. In order to trigger this section, there must be a statement ***in writing*** regarding the debtor's ***financial condition.***[58]

---

[56] This judgment may appear superfluous in light of the Court's later finding of nondischargeability under § 523(a)(4). The Court has chosen to address the § 523(a)(2)(A) claim in order to assist any Court that may be called upon to review this decision.

[57] § 523(a)(2)(B).

[58] *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 200 B.R. 399, 401–02 (D. Colo. 1996), *aff'd* 125 F.3d 1358 (10th Cir. 1997).

No such document exists in the record before the Court. We have bank records, tax returns, settlement documents related to the workmen's compensation claims, letters, receipts, and the powers of attorney. Of these documents, the only ones even arguably relied upon by Hubanks with respect to the loss of his monies are the powers of attorney. The powers of attorney are not statements regarding Sabra or David's financial condition. There is no cause of action under § 523(a)(2)(B).

### *§ 523(a)(4)*

Hubanks also contends that he is entitled to a judgment of all amounts taken from the Hubanks Account that were not spent for his benefit under § 523(a)(4) of the Bankruptcy Code, which provides that

> (a)    A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt–
>
>> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.][59]

Two elements must be established to except a debt from discharge under § 523(a)(4): (1) there must be a showing of defalcation; and (2) the debtor must have been acting in a fiduciary capacity. This Court has previously held that

> Section 523(a)(4) clearly qualifies the term "defalcation" by "[t]he phrase 'while acting in a fiduciary capacity.'" Therefore, "[t]here is no need to consider whether a debtor has committed 'fraud or defalcation' unless it is first determined that debtor was 'acting in a fiduciary capacity.'" [60]

Under Oklahoma law, a party acting under a durable power of attorney "is bound by standards of

---

[59]  § 523(a)(4).

[60]  *Smolen v. Hatley (In re Hatley)*, 227 B.R. 753, 756 (Bankr. N.D. Okla. 1998) (citations omitted), *aff'd,* 227 B.R. 757 (10th Cir. BAP 1998), *aff'd,* 194 F.3d 1320 (10th Cir. 1999).

conduct and liability applicable to other fiduciaries."[61]  Under the Restatement of Agency 3rd, "[a]n

agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the

agency relationship."[62]

There is no doubt that Sabra acted as Hubanks's fiduciary under the powers of attorney.  The

same is true as a matter of law, and the Durable Power of Attorney so informed Sabra in no

uncertain terms.  The only remaining question is whether her taking of Hubanks's funds and

spending them for her own (or her family's) personal benefit constituted a defalcation.

Fortunately for us, the United States Supreme Court has recently answered that question.

As the Bankruptcy Appellate Panel of the Tenth Circuit recently noted,

> [O]n May 13, 2013, the United States Supreme Court decided *Bullock v. BankChampaign, N.A.*  In *Bullock*, the Supreme Court held that
>
>> Section 523(a)(4) of the Federal Bankruptcy Code provides that an individual cannot obtain a bankruptcy discharge from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). We here consider the scope of the term "defalcation." We hold that it includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase.  We describe that state of mind as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior.

The Supreme Court went on to state that

>> Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong.  We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent.  Thus, we include reckless conduct of the kind set forth in the Model Penal Code.  Where actual knowledge of wrongdoing is lacking, we consider conduct as

---

[61]  Okla. Stat. Ann. Tit. 58,  § 1081.

[62]  Restatement (Third) of Agency § 8.01 (2006).

> equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). See *id.,* § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include " 'wilful blindness' "). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.,* § 2.02(2)(c), at 226 (emphasis added). Cf. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 47 L. Ed. 2d 668 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

> . . . [I]n order to hold a debt non-dischargeable under § 523(a)(4), a bankruptcy court must find that the debtor acted with wrongful intent, or, at a minimum, with a conscious disregard of his or her fiduciary duties.[63]

The Court has little difficulty finding that Sabra acted with wrongful intent and with a full disregard of the fiduciary duty she owed to her brother. Each and every time money was placed in the Hubanks Account, regardless of its source, Sabra, with very limited exceptions, spent the money as if it were her own. When Hubanks asked her if the disability payments from the SSA and Met Life had stopped, she lied to him. When the workmen's compensation claim settled, she took that money and dissipated it almost immediately. She knew exactly what she was doing and who she intended to benefit.

The parties have agreed that, after giving Sabra credit for amounts spent for the benefit of Hubanks and amounts repaid to Hubanks, the sum of $229,109.23 remains at issue. Hubanks is entitled to a judgment against Sabra for this amount. The entire judgment is non-dischargeable

---

[63] *Jantz v, Karch (In re Karch)*, 499 B.R. 903, 906 (10th Cir. BAP 2013) (footnotes omitted) (per Michael, J.) (citing *Bullock v. BankChampaign, N.A.* , ___ U.S. ___, 133 S.Ct. 1754, 1757, 1759–60 (2013)).

under § 523(a)(4).[64]

*Conspiracy and David's Liability to Hubanks*

While Sabra's liability to Hubanks, whether by fraudulent misrepresentation or breach of fiduciary duty, is well established, the same cannot be said for David.  When questioned regarding this matter during closing argument, counsel for Hubanks stated his belief that David was liable to Hubanks on a theory of conspiracy.  No such theory is pled, nor is the concept of conspiracy found in the pretrial order.[65]  The Court has found that Sabra made fraudulent representations to Hubanks, and breached her fiduciary duties to him.  It did so upon the basis of the evidence in the record. Sabra, and only Sabra, had the ability to access the Hubanks Account.  Sabra, and only Sabra, signed the Durable POA.  In reviewing the transactions in the Hubanks Account, there is no evidence that anyone but Sabra engaged in those transactions.  Not one of the checks in evidence drawn on the Hubanks Account was signed by David.   David did not have the authority to sign on or withdraw funds from the Hubanks Account.  Upon direct examination, David testified did he not involve himself in the financial record keeping or management of the Jouett family and that all of that was done by his wife.  The testimony was not seriously challenged on cross-examination.

Hubanks asks us to draw an inference that David was involved in the fraudulent activities of Sabra, based upon the fact that they are husband and wife and because David benefitted from those transactions.  There is a rather broad chasm between inference and evidence.  The burden here is upon Hubanks to establish, by a preponderance of the *evidence*, that David conspired with Sabra to deplete the Hubanks Account.  There was not enough evidence developed at trial in order for Hubanks to carry his burden in this regard.  The Court cannot conclude that David is liable to

---

[64]  This amount *includes* the $116,551.24 found non-dischargeable under § 523(a)(2)(A).

[65]  *See Docket No. 37.*

Hubanks on the record before it.  Therefore, any finding of non-dischargeability in this case shall be limited to Sabra.

***Attorney's Fees***

Hubanks has asked this Court for an award of attorney's fees in this action.  He has not cited and the Court is not aware of any provision in the United States Bankruptcy Code or Oklahoma state law allowing for such a fee award.[66]  The Court must presume that Hubanks seeks his attorney's fees as the prevailing party in this adversary proceeding.

With respect to the issue of awarding attorney's fees, this Court has already expressed its opinion on the issue:

> The award of attorneys' fees to a prevailing party runs contrary to established principle.  As another bankruptcy court has noted:
>
>> [I]n absence of any statutory authority to award attorneys' fees, the Court will adhere to the "American Rule," which provides that in cases that are based upon or involve federal law, attorneys' fees are not allowable absent a statutory basis or enforceable contract between the parties.
>
> *In re Baker*, 205 B.R. 125, 135 (Bankr. N.D. Ill. 1997) (citations omitted).   The policy consideration underlying the American Rule
>
>> is that because "litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel."
>
> *Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 765 (10th Cir. 1997) (citations omitted).  Under the American Rule, attorneys' fees are not considered as an element of damages which a party suffers as a result of litigation.  This Court believes the American Rule is applicable to bankruptcy cases and will not shift fees between the

---

[66]  Section 523(d) allows a ***debtor*** to recover his or her attorney's fees where a creditor requests a determination that a consumer debt is non-dischargeable and the court determines that the position of the creditor was not substantially justified.  The section is not applicable here. Hubanks is not the debtor in this case.

parties as a matter of course.[67]

*Nichols* remains good law.  Absent a statutory or contractual basis, the Court declines to enter an award of attorney's fees.[68]

### Punitive Damages

Hubanks also seeks an award of punitive damages.  It is well established that a bankruptcy court has the power, in appropriate situations, to enter an award of punitive damages.[69]  In order to enter an award of punitive damages, there must be a basis for such an award, under either state or federal law.[70]

Hubanks is required to establish his entitlement to a punitive damage award as a matter of fact and of law.  There is no provision in the Bankruptcy Code for an award of punitive damages under § 523 of the Bankruptcy Code.  While the facts of this case might justify an award of punitive damages under Oklahoma state law, none of the relevant Oklahoma state law is before the Court.  The Court will not ferret out the law beneficial to a party's position.  Accordingly, the Court declines to enter an award of punitive damages in this case.

### Conclusion

Judgment is entered in favor of Hubanks and against Sabra Jouett in the amount of $229,109.23.  The judgment shall not be discharged in the bankruptcy case of Sabra and David

---

[67]  *In re Nichols,* 221 B.R. 275, 278 (Bankr. N.D. Okla. 1998) (hereafter *"Nichols"*).

[68]  If there is state law supporting a fee award that might somehow apply here, Hubanks has failed to present that law to the Court.

[69]  *See, e.g., Hancock Bank v. Harper (In re Harper)*, 475 B.R. 540, 550 n.24 (Bankr. S.D. Miss. 2012) (and cases cited therein).

[70]  *See, e.g. In re Diviney*, 211 B.R. 951 (Bankr. N.D. Okla. 1997) (punitive damages awarded pursuant to § 362(h)(1) (now § 362(k)(1)), *aff'd*, 225 B.R. 762 (10th Cir. BAP 1998), abrogated on other grounds by *In re Johnson*, 501 F.3d 1163 (10th Cir. 2007): *In re Reuter*, 427 B.R. 727, 767–68 (Bankr. W.D. Mo. 2010) (applying Missouri state law).

Jouett.  Judgment shall be entered in favor of David Jouett on all claims brought against him.

A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 12th day of March, 2014.


TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

6681.6